## GIBSON *et al. v.* FIRST NATIONAL BANK OF MARIETTA.

1. To complaint brought by the plaintiff bank the defendant, in a part of the answer filed, set up the defense that he was induced by the plaintiff, through its cashier, to execute the note sued on with the understanding and agreement between the defendant and the cashier and a third party that the execution of a bill of sale to the bank by the third party referred to would operate as payment of the note. *Held,* that the court did not err in sustaining the demurrer to this part of the answer. It was an attempt to contradict and vary an unconditional written promise to pay a certain sum of money, by setting up a contemporaneous parol agreement contrary to the writing; and it was therefore demurrable.

2. In an amendment to the answer the defendant set up the defense that there was an agreement made between the plaintiff, through its cashier, and a named third party and the defendant, which was in substance an agreement that upon the execution of the note sued on the plaintiff would advance the amount of the principal of the note, the price of certain tractors, and that the third party, the owner of the tractors, should execute and deliver to the plaintiff a bill of sale to the tractors, and that the bill of sale should be received by the plaintiff in payment of the note; and further, that the bill of sale was in fact accepted by the bank subsequently to the execution of the note and at the time the bill of sale was executed, in payment of the note. This part of the defense was also demurred to, and the court sustained the demurrer to all the allegations setting up the alleged parol agreement or understanding entered into at the time of the execution of the note sued on, but

overruled the demurrers to the allegations in this part of the answer which alleged that the bank had, subsequently to the execution of the note and at the time the bill of sale was executed, accepted the bill of sale in satisfaction and settlement of the note. It follows from what is said in the preceding headnote that the ruling here complained of was not error.

3. The rulings made above dispose of the exception to the ruling of the court excluding certain evidence as to a conversation between the defendant and the cashier of the plaintiff bank, had contemporaneously with the execution of the note, the evidence excluded tending to prove that the cashier said in the course of the conversation that "he would take the bill of sale and that would pay the note."

4. Complaint is made that the defendant made answer in the affirmative to the question as to whether or not the note sued on was the same note "that the bill of sale was taken for." No ruling of the court seems to have been invoked on this evidence; at least none is set forth in the ground of the motion for new trial, and the court will not look to other parts of the record to ascertain what ruling was made.

5. The exclusion of the evidence of the witness L. H. Brown, as to what was said by the cashier of the plaintiff bank at the time of the execution of the note in regard to the defendant never having to pay the same, was not error under the principle ruled in the first division and headnote.

6. The evidence submitted required the verdict directed by the court.

No. 4212. MAY 15, 1924.

Equitable petition. Before Judge Blair. Cobb superior court. January 19, 1924.

*Mozley & Gann* and *J. Z. Foster,* for plaintiffs in error.

*John T. Dorsey* and *Morris, Hawkins & Wallace,* contra.

BECK, P. J. The First National Bank of Marietta brought its suit to the November term, 1922, of Cobb superior court, against George W. Gibson and Mrs. M. L. Gibson, on a promissory note for the principal sum of $5,050, dated October 21, 1920, and due on demand. It was alleged that no part of the note had been paid, but interest had been paid thereon to December 30, 1921. The prayers of the petition were, for judgment against G. W. Gibson for the principal, interest, and attorney's fees, and for the recovery of a special verdict and judgment against certain described personal property. There was also a prayer that certain deeds executed by G. W. Gibson to Mrs. M. L. Gibson be declared fraudulent and void, and that they be cancelled. Answers were filed by G. W. Gibson and by Mrs. M. L. Gibson. Demurrers to the answers were filed, some of which were sustained and some overruled. The trial proceeded, and at the conclusion of the evidence the court

directed a verdict for the plaintiff. The defendants made a motion for new trial, which was overruled.

1. Mrs. M. L. Gibson was made a joint defendant in the case, because she was a necessary party inasmuch as equitable relief was sought against her, the plaintiff in its petition having attacked as fraudulent and void certain deeds executed by G. W. Gibson to Mrs. M. L. Gibson. But before argument began, the issue made under the allegations of fraud in the execution of the deeds and the denial of the fraud was eliminated by certain admissions made by the defendants; and it is not necessary to consider the questions made in regard to the deeds, nor any of the questions made by the answer of Mrs. Gibson. Under the issues left after the elimination of those relating to the attack made upon the deeds, it is only necessary to consider and determine the questions made by the answer of the other defendant and the demurrers thereto. He, after filing his original answer, submitted various amendments. There were demurrers to his answer and to the amendments submitted, each of them containing several grounds. It is not necessary to set out the petition and the answer in extenso. The answer to the petition and the demurrers to the answer and the amendments make two questions relating to the vital issues of the case: In the first place, the defendant, in the answer filed, set up the defense that he was induced by the plaintiff, through its cashier D. R. Little, to execute the note sued on, "with the distinct understanding and agreement between the defendant and Little and one Brown [whose relation to the case will be indicated later on] that the execution of a bill of sale to the bank by Brown would operate as payment of the note." Upon demurrer, the part of the answer setting up this defense was stricken; and to the judgment of the court striking the defense just stated the defendant excepted.

The court did not err in sustaining the demurrer to that part of the answer of the defendant setting up the defense thus stricken. In the first place, this part of the answer was an attempt to contradict and vary an unconditional written promise to pay a certain sum of money, by setting up a contemporaneous parol agreement contrary to the writing. And parol evidence is inadmissible to add to, take from, or vary a written contract. Civil Code, § 4268 (1). In the case of *Dendy* v. *Gamble, 59 Ga.* 434, which was a suit against principal and surety on a note, this court said: "The

note, however, is absolute and unconditional. It is an express contract, on the part of both principal and surety, to pay a sum of money on or before a given day, less than a month after its date. When a man's real contract is not to pay, what sense or reason is there in signing a written contract that he will pay? To allow such a defense as this to be effective would be to overthrow the most trustworthy monuments of the engagements of men to men. What security would the most solemn writings any longer afford? In striking the plea, on demurrer, the court made the only proper disposition of it." In the case of *Haymans* v. *Bennett, 29 Ga. App.* 265 (114 S. E. 923), it was said: "No defense to the note sued on was made by the plea in which the defendant, who was sued as surety, set up that there was no consideration for his signing this note or the note of which it was a renewal; that he signed as an accommodation indorser at the request of the president of the bank to which it was payable, the president stating that he, for the bank, would guarantee that the defendant would not be called upon to pay it; and that at the time of his signing the original note the president represented to him that the maker was able to pay it, but this representation was untrue and was made with intent to deceive and did deceive him, and that without such statement he would not have signed the note." In *Hirsch* v. *Oliver, 91 Ga.* 554 (18 S. E. 354), it was held: "To an action against the maker on his negotiable promissory notes, a plea that he executed them with the understanding that he was not to be bound, and for a purpose wholly at variance with their plain tenor and import, is no defense, there being no denial that the notes were made and delivered, and no suggestion in the plea that the understanding and purpose alleged were evidenced by any writing, or that they were omitted from the notes by fraud, accident, or mistake." In *Dyar* v. *Walton, 79 Ga.* 466 (7 S. E. 220), it was ruled: "Parol evidence (especially of the debtor himself) that a settlement closed up by absolute notes and mortgages was, by oral agreement of the parties, to be revised by the debtor, and the notes and mortgages reduced by crediting down all errors, contradicts the writings, and is inadmissible." "Parol negotiations eventuating in an unambiguous written contract are merged in the writing, and are ineffectual to vary or contradict the writing." *Capps* v. *Edwards, 130 Ga.* 146 (60 S. E. 455). "Before parol evidence can be admitted to show

a collateral agreement, it must appear, either from the contract itself or from the attendant circumstances, that the contract is incomplete, and that what is sought to be shown as a collateral agreement does not in any way conflict with or contradict what is contained in the writing." *Brosseau* v. *Jacobs,* 147 *Ga.* 185 (93 S. E. 293). Citations of authorities to the same effect might be multiplied endlessly.

2. In an amendment to the answer George W. Gibson set up the defense that there was an agreement made between plaintiff, through its cashier, and L. H. Brown and the defendant, which was in substance an agreement that upon the execution of the note sued on the plaintiff would advance the amount of the principal, the price of certain tractors, and that L. H. Brown should execute and deliver to plaintiff a bill of sale to the tractors, and that said bill of sale should be received by plaintiff. in payment of the note; and further, that the bill of sale referred to was in fact accepted by the bank subsequently to the execution of the note and at the time the bill of sale was executed in payment of the note. This part of the defense was also demurred to, and the court sustained the demurrer to all the allegations setting up the alleged parol agreement or understanding entered into at the time of the execution of the note sued on, but overruled the demurrers to the allegations in this part of the answer which showed that the bank had, subsequently to the execution of the note, and at the time the bill of sale was executed, accepted the bill of sale in satisfaction and settlement of the note. It follows from what we have said that the court did not err in sustaining the demurrers to all of the allegations setting up the defense based upon the parol agreement made at the time of the execution of the note. The authorities cited above need not be cited here again; but in connection with those authorities the ruling in the case of *Cole* v. *Bank of Bowersville,* 31 *Ga. App.* 435 (120 S. E. 790), is appropriate and pertinent. It was there said: "A note in which it is stipulated that a certain sum will be paid means that this sum will be paid in money, and the maker or the indorser will not be heard to plead or prove that there was a parol agreement by which the note was to be satisfied with something else than money." See also *Kerr* v. *Holder,* 13 *Ga. App.* 9 (78 S. E. 682), and cases cited. The court permitted the pleaded defense to stand, that, subsequent-

ly to the execution of the note, the bank had accepted the bill of sale in satisfaction and settlement thereof; and upon this issue, in the further progress of the trial, evidence was submitted.

3. In one ground of the motion for new trial error is assigned upon the ruling of the court which excluded the answer of the defendant to the following question propounded by his counsel: "State whether or not you had a conversation with Mr. Little after they took this bill of sale, and whether or not he acknowledged the payment of this note?" The answer of the witness was, "He said he would take the bill of sale, and that would pay the note." It is insisted that the exclusion of this evidence was error, because "it was competent and material to show that said note, which was the note sued on, was to be paid off and settled by the taking of the bill of sale, and for this reason the exclusion of the evidence was error." While apparently, if we consider the question alone, the conversation referred to by the witness was had with Little, the cashier of the bank, subsequently to the taking of the bill of sale, as a matter of fact it was contemporaneously with the execution of the note that Little said he would "take the bill of sale, and that would pay the note;" for the witness distinctly stated, "This occurred at the time that he signed the note." And this assignment of error is disposed of by what we have said above.

4, 5. The rulings made in headnotes 4 and 5 require no elaboration.

6. The motion for new trial contains the exception that the court erred in directing a verdict, under the evidence in the case. The court did not err in directing a verdict in favor of the plaintiff. There is no merit in the contention that the note was without consideration. Conceding that Gibson, the defendant, had no interest in the tractors which had been shipped to Brown upon a bill of lading with sight-draft attached, and that the note was given for the money with which to meet the sight-draft so that the tractors could be delivered to Brown, and that Gibson's only interest in the tractors was as a salesman and a demonstrator, nevertheless he procured the money from the bank, if not for himself, for another, and this was consideration sufficient to support the note.

The other plea, which was in substance that subsequently to the execution of the note the bank accepted the bill of sale in payment of the note, was not supported by the evidence. It is insisted in the

argument of counsel for the plaintiff in error that the bill of sale was absolute on its face; and that inasmuch as the plaintiff took possession of the property described in the bill of sale, it would not be heard to set up the contention that the bill of sale was not absolute in its character, and that it was intended merely as a security for the note. The evidence shows that the tractors were not taken possession of by the bank. They were taken possession of by L. H. Brown, who was a dealer in such commodities, and by the defendant as his agent or demonstrator. It is true that long afterwards, when Brown became a bankrupt and the tractors were located at different points in the county, in order to protect them from deterioration and destruction the bank had them stored or placed in possession of parties where they might be protected from the weather. This was not in the least inconsistent with the bank's theory that the bill of sale in question was taken merely as security for the note. It is true that Gibson did testify: "That note has been paid off. They took a bill of sale to the property for which the money was obtained, and it paid the note. I was not present and did not see the bill of sale taken. I knew he had taken it, because I saw it on the record. The bank took charge of these tractors that they allege in that bill of sale. After they took charge of these tractors they tried to employ me to sell these tractors. Mr. Little, the cashier of the bank, was the one that tried to employ me; and he was the man who made this original contract when I signed the note. I did not try to sell for them at that time. This was after they had taken charge of the tractors. Before Mr. Brown went into bankruptcy the bank took charge of these tractors. This conversation I had with Mr. Little was after they had taken charge of the tractors." In this evidence will be noted the statement that the note has been paid off, and that "before Mr. Brown went into bankruptcy the bank took charge of these tractors." This testimony of the defendant does not show the exact time the tractors were "taken charge of" by the bank, but other uncontradicted evidence in the case shows that it did not, until long after the execution of the bill of sale, take possession of this property, and it was then for the purpose of caring for it so that the property might not be wasted and destroyed. Mr. Gibson's own testimony shows that the bank did not go into possession of the property under the bill of sale until it took

possession of the same to prevent waste; for in another part of his evidence we find the following: "I don't remember how long it was; when I first saw them they were at Brown's garage. I went to demonstrating and trying to sell the tractors, and tried to sell them for Mr. Brown. It was after the note was signed in the spring. It was in the spring after the note was signed in 1921. I worked some for Mr. Brown, a little bit, I don't know how long. I took the four tractors described in the bill of sale for Mr. Brown. I went down to the lower part of the county on Spinks' place to demonstrate one, but I didn't carry it there. . . I left the tractor with Spinks. Brown told me to leave it with Spinks. I never told Mr. Spinks that Brown would pay for leaving it there. That tractor has been there at Spinks' ever since. I demonstrated another one for a man by the name of McIntyre; a negro carried it there. He was working for the L. H. Brown Auto Company. That was the same fall this note was signed. I left it under this shed for L. H. Brown. I won't be positive where I demonstrated the other two, but I think I demonstrated one of them at a man's by the name of Fowler, up here on the Kennesaw Road, and one out there at Summerour's, and one, I can't say which one, at Al Bishop's. I was demonstrating them for Brown. When I got through demonstrating them I brought one of them to the L. H. Brown garage and left the other in the country. I think it was in the fall when I was demonstrating for Brown. I demonstrated one in the spring of 1921, but I can't say which one, for Brown. I tried to sell them when I wasn't demonstrating after them for Brown. I did not continue in the employ of Brown a great while. I don't know how long; probably three or four months. I don't remember when I quit his employ. I couldn't say . . There was two of these tractors at Brown's garage for a long while, and the other two in the country. I have never seen Mr. Little or Mr. Massey in the physical possession of them. Mr. Little and Mr. Massey are cashier and president of the bank."

The testimony of L. H. Brown shows that the bank did not go into possession of the property (of which it took possession for the purpose of protecting it) until long after the bill of sale was signed. His testimony in part is as follows: "After this note was executed and the bill of lading delivered, I suppose I got the tractors. . . When we first got these tractors out I carried them

to my place.  G. W. Gibson tried to sell a few of them, I think. I don't know how long, possibly a couple of months.  He went out and demonstrated the tractors.  That was what he was doing, working for me demonstrating the machines, if we found a prospect.  He demonstrated them in different sections of the county, I think.  As far as knowing—yes, he demonstrated in different sections of the county, that is, not so much either, because a lot. of times the weather wouldn't permit.  He demonstrated all along, of course, when we found a prospect. . .  I signed that paper presented to me, dated 10th day of November, 1920, signed L. H. Brown, doing business as in the name of L. H. Brown Auto Company, recorded 11-10-20, clerk's office Cobb superior court.  I don't think it was given to help secure the note that Gibson signed; if it had been, it would have said; it was a straight bill of sale." Q. "Now, will you state under oath whether or not that paper that I have just asked you about, dated November 10th, 1920, twenty days after that note was given, whether or not that paper was executed by you and given to the bank as security to the note of $5,050 that you said Mr. Gibson signed as an accommodation for you?"  A. "I suppose that was the reason the note was given, that was the intention I suppose, but it didn't mention it was securing the Gibson note.  It was a straight bill of sale to the bank.  I suppose that was the idea in taking a bill of sale.  I don't know.  I executed, signed, and delivered that paper you have just asked me about, dated November 10th, 1920, to the First National Bank, upon the bank's request; just as I have said, it was, I suppose, to secure that note; if it wasn't, I don't know what other purpose it was—I suppose that was it.  From the time that paper, dated November 10th, 1920, was executed and delivered to the bank I continued to try to sell these tractors until I went out of business. I suppose these tractors referred to in that paper dated November 10th, 1920, were in my possession from the time the paper was delivered to the bank up to the time I went into bankruptcy in 1922; there was two at the garage, and the other two where they had been for some time.  I was in possession of that garage and was running it.  The First National Bank didn't have any connection in the operation of that garage that I know of.  I paid all the interest that was paid on that note dated October 21, 1920, due on demand, $5,050.00, signed by G. W. Gibson.  I went out

of business in the early part of the year 1922. . . They didn't pay me a thing the day I signed this paper. The intention was to take this bill of sale in settlement of the Gibson note. This paper was given, the way I understand it, as security for the bank's protection. It was for the same amount as the Gibson note. I did not get any $5,050 from them that day. I couldn't say whether that was given to secure the note or given in settlement or not. The bank—it's a straight bill of sale to the bank for that amount, and it was either to secure the bank or secure the Gibson note. There is nothing in here about securing the Gibson note at all. I have already answered what that bill of sale was given for, once as near as I know how; it was either given in settlement of the note or to secure the bank, or to secure the note, one. If this $5,050 consideration was to pay off anything, it was to pay off the note, of course. They did not pay me any money that day. . . The bank had this bill of sale prepared. All I had to do was just to sign the paper here as they handed it to me to sign. I don't remember whether at the time I signed this paper here, L. H. Brown Auto Company, they said that this was in settlement of the George Gibson note or not. I will say this, if it was given for settlement of anything it couldn't have been in settlement of anything else except that note. . . The bank had a bill of sale of the tractors; in case I had sold the tractors the money I got out of the tractors had to be turned over to the First National Bank. The L. H. Brown Auto Company was L. H. Brown individually, just doing business under that name. At the time the first note was given I didn't see anybody present except myself, Mr. Gibson, and Mr. Little." As to the question, "You stated as tractors were sold the money was to be paid to the bank. What paper was it to be credited on?" He answered: "That is a question I don't know just how to answer; as to whether credited on the bill of sale, they had a straight bill of sale to the tractors. The Gibson note was still there. I suppose it was to be credited on the Gibson note and the bill of sale too. . . Then after that, on the 10th day of November, 1920, I delivered this bill of sale dated on that date to the bank for the purpose of either securing the bank or the Gibson note, and continued the sale of these four tractors on my own responsibility, with the understanding of course the money was to be turned over to the First National Bank, to be credited on

this indebtedness for $5,050 due the bank. I didn't give Mr. G. W. Gibson anything to secure him for signing the $5,050 note for me, and no one did for me."

Taking the entire testimony together, it required a finding that the bill of sale was executed to secure the payment of the Gibson note, and it was not intended to be an unconditional sale passing title to the tractors into the bank. This being true, a verdict for the plaintiff under the evidence was demanded, and the court did not err in so directing the jury to find.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*